IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

Fuel Clothing Company, Inc.,           )       C/A No. 3:12-00555-MBS
                                       )
                Plaintiff,             )
                                       )
        vs.                            )       **<u>ORDER AND OPINION</u>**
                                       )
Nike, Inc.,                            )
                                       )
                Defendant.             )
_____)

On February 27, 2012, Fuel Clothing Company, Inc. ("Plaintiff" or "Fuel") filed the within

action against Nike, Inc. ("Defendant" or "Nike"), asserting causes of actions for federal trademark

infringement, common law trademark infringement and unfair competition, federal unfair

competition and false designation of origin, federal trademark dilution, and violations of the South

Carolina Unfair Trade Practices Act ("SCUTPA"). ECF No. 1. On May 7, 2012, Nike filed its

answer, in which it denied all allegations and asserted counterclaims for declaratory relief. ECF No.

10. Fuel answered Nike's counterclaims on May 23, 2012. ECF No. 19. On May 23, 2013, Nike

filed a motion for summary judgment, ECF No. 68, to which Fuel filed a response on June 10, 2013.

ECF No. 83. Nike filed a reply on June 20, 2013. ECF No. 96. The court held a hearing on Nike's

motion for summary judgment on November 4, 2013.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Fuel manufactures and markets apparel and accessories for the actions sports industry, which

includes skateboarding, snowboarding, surfing, motocross, auto racing, mountain biking, and BMX

biking. ECF No. 1 at 2, ECF No. 69-2 at 6-7. Fuel's products are sold across the United States

through Fuel's own retail store in Hilton Head Island, South Carolina; through retail stores across

the country; and through the Internet. ECF No. 83 at 3. Fuel's current sole-owner and president, Shane Gould ("Mr. Gould"), co-founded the company in 1992. *Id.* Since its beginnings, Fuel's products have borne the "Fuel" mark, which is protected by Fuel's trademark, U.S. Trademark Registration No. 2,290,931 ("the '931 Registration"). ECF No. 83-1 at 1. Fuel applied for this trademark in 1998, and the United States Patent and Trademark Office placed the "Fuel" mark on the Principal Register for clothing goods in November 1999. *Id.* Specifically, the "Fuel" mark is registered in International Class 25 for use in connection with "clothing, namely coats, hats, shirts, skirts, dresses, swim wear, sweaters, T-shirts, tank tops, socks, belts and pants." *Id.*

With regard to the format of the "Fuel" mark, Mr. Gould indicated in his deposition testimony that his company "[has] a thousand different [uses]" for the "Fuel" mark. ECF No. 69-2 at 131. These multiple formats include various colors, designs, shapes, and fonts displaying the "Fuel" mark. *See* ECF Nos. 70-10, 70-11. In some instances, the "Fuel" mark is accompanied by an additional image, such as a flame or a skull. *See id.* Additionally, some uses of the mark include phrases, such as "Fuel Station Ride Shop" and "Powered by Fuel." *See* ECF No. 70-11.

Since its beginnings in 1992, Fuel has taken steps to protect its mark against numerous companies that have allegedly sought to infringe on its mark, including litigation proceedings with five separate companies and agreements with almost twenty other companies. ECF No. 83-1. These steps have included litigation proceedings against Fuel TV, Inc. and Safari Shirt Company, both of which were resolved by settlement agreements. Fuel has also negotiated an agreement with Fuel Helmets, Inc. regarding each party's respective use of "Fuel." ECF No. 68-1 at 12.

The within action arose following Nike's use of the term "Fuel" in connection with the sale of sports products and related apparel, including electronic wristbands and promotional t-shirts.

Nike is a global marketer of athletic footwear, apparel, and equipment. ECF No. 68-1 at 15. In furtherance of its mission to "bring motivation and inspiration to every athlete[] in the world," Nike "invented a new metric" to measure a person's daily physical activity, including calories expended and steps taken. ECF No. 68-1 at 15. Nike named this new metric "NikeFuel" to convey the nature of the metric to consumers. *Id.* To measure "NikeFuel" points earned, Nike created the NIKE+FUELBAND, an electronic wristband that tracks physical activity metrics including calories expended, steps taken, and "NikeFuel" points earned. *Id.* The name of the NIKE+FUELBAND derives from the "NikeFuel" point system, with "Fuel" referring to the "NikeFuel points" obtained through daily physical activity and "Band" indicating that the product is worn on the wrist. *Id.* at 16.

The NIKE+FUELBAND includes the Nike "swoosh" mark on the clasp of the product. *Id.* The display screen of the NIKE+FUELBAND is scrolling, meaning it displays different images at different times, including Nike's "swoosh" mark and the "Fuel" mark. *Id.* The packaging of the NIKE+FUELBAND includes the "swoosh" mark, the "NIKE+FUELBAND" symbol in all capital letters, and an image of the word "FUEL" displayed on the digital screen of the band. *Id.* The NIKE+FUELBAND launched to consumers in January 2012. *Id.*

In conjunction with the launch of the NIKE+FUELBAND, Nike sold promotional t-shirts bearing descriptive phrases such as "Fuel it up," "Fuel the people," and "Fuel this." *Id.* at 17. These promotional t-shirts also contained the Nike "swoosh" symbol on the lower front and the "NIKE+FUELBAND" mark on the back of the shirts. *Id.* at 17-18. Nike contends that "these shirts amount to less than one-percent of all [NIKE+FUELBAND] sales." *Id.* at 18. To further promote the NIKE+FUELBAND, Nike released a video featuring three famous athletes, with one athlete

running (soccer star Hope Solo), one athlete weightlifting and playing basketball (football star Ndamukong Suh), and one athlete skateboarding (professional skateboarder Paul Rodriguez). *Id.* In the video, each of the athletes is wearing the NIKE+FUELBAND. *Id.*

Following the launch of the NIKE+FUELBAND, the United States Patent and Trademark Office allowed "NIKE + FUELBAND" to be registered as a trademark in International Class 9 for electronic monitoring devices, International Class 10 for health monitoring devices, and International Class 14 for watches and bracelets. ECF No. 72-10. The United States Patent and Trademark Office also allowed "NIKEFUEL" to be registered as a trademark in International Class 9 for electronic monitoring devices, International Class 38 as a website featuring information regarding fitness and training, International Class 41 for providing access to on-line live workouts and fitness instructions, and International Class 42 as an interactive website allowing users to monitor fitness. *Id.* Nike did not seek trademark registration in International Class 25 for apparel, the class in which the "Fuel" mark is registered. *Id.*

Fuel alleges in its complaint that Nike's use of the "Fuel" mark is likely to cause confusion among consumers and is infringing on Fuel's mark. ECF No. 1. Nike denies any infringement on Fuel's mark and moves for summary judgment as to all of Fuel's claims.

## II. STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248–49 (1986). A genuine question of material fact exists where, after reviewing the record as a whole, the court

finds that a reasonable jury could return a verdict for the non-moving party. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. 2011). Summary judgment "is as appropriate in a trademark case as in any other case and should be granted or denied on the same principles." *George & Co., LLC v. Imagination Entm't Ltd.* (*George I*), No. 1:07CV498 (LMB/TRJ), 2008 WL 2883771, at *2 (E.D. Va. July 25, 2008), *aff'd*, 575 F.3d 383 (4th Cir. 2009).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). The non-moving party may not oppose a motion for summary judgment with mere allegations or denials of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 252; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009).

## III. DISCUSSION

Nike moves for summary judgment on two separate grounds. First, Nike contends that all of Fuel's claims fail as a matter of law because Fuel has abandoned its mark through naked licensing. Second, Nike contends that Fuel's federal trademark infringement, common law trademark

infringement and unfair competition, federal unfair competition and false designation of origin, and SCUTPA claims fail as a matter of law because there is no likelihood of confusion among relevant consumers. In response, Fuel contends that issues of fact exist with respect to naked licensing and likelihood of confusion that preclude summary judgment. Nike's two grounds for summary judgment will be addressed in turn.

**A.    *Abandonment through Naked Licensing***

Nike moves for summary judgment as to all of Fuel's claims based on the affirmative defense of abandonment. Specifically, Nike contends that separate agreements between Fuel and Fuel TV, Inc., Safari Shirt Company, and Fuel Helmets, Inc. constitute "naked licenses" that result in the abandonment of Fuel's mark. Fuel denies any abandonment of its mark and asserts that none of the three agreements at issue constitute a naked license.

"A licensor of a trademark or tradename must exercise control over its use in order to avoid abandonment of the trademark or tradename." *Stanfield v. Osborne Indus., Inc.*, 839 F. Supp. 1499, 1504 (D. Kan. 1993), *aff'd*, 52 F.3d 867 (10th Cir. 1995). The Lanham Act recognizes a cause of action for trademark abandonment pursuant to 15 U.S.C. § 1127, which provides that:

> [a] mark shall be deemed to be abandoned. . . [w]hen any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark.

15. U.S.C. § 1127. One method by which a mark may be abandoned is through "naked licensing," which occurs "[w]hen a trademark owner fails to exercise reasonable control over the use of a mark by a licensee, such that the presence of the mark on the licensee's goods or services misrepresents their connection with the trademark owner since the mark no longer identifies goods or services that

are under the control of the owner of the mark and the mark can no longer provide a meaningful assurance of quality." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 764 (6th Cir. 2005) (internal quotations omitted).

Because all agreements authorizing use of a protected mark are not categorized as "licenses," a court must consider whether an agreement constitutes a "license" for the purposes of naked licensing. *See Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1076 (5th Cir. 1997). In making this determination, "the essential inquiry is whether the right granted by the subject agreement permits an *infringing* use of the license." *Id.* For example, "some agreements which allow another party use of the subject mark constitute 'consent-to-use' agreements and not licenses." *Id.* Indeed, such consensual agreements are not attempts "to transfer or license the use of a trademark . . . but [instead] fix[] and define[] the existing trademark of each . . . [so] that confusion and infringement may be prevented." *Id.* In that regard, a court should "not find the existence of a trademark license when an authorization of trademark use is structured in such a way as to avoid misleading or confusing consumers as to the origin and/or nature of the respective parties' goods." *Id.*

However, if an agreement is properly classified as a "license," a court must consider "whether the license contained an express contractual right to inspect and supervise the licensee's operations," or, if such contractual rights are absent, whether the licensor has in fact exercised sufficient quality control over its license. *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 516 (9th Cir. 2010). With respect to the extent of control necessary, courts have noted that "[i]t is difficult, if not impossible to define in the abstract exactly how much control and inspection is needed to satisfy the requirement of quality control over trademark licensees . . . [and] the standard of quality control and

the degree of necessary inspection and policing by the licensor will vary with the wide range of licensing situations in use in the modern marketplace." *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 595-96 (9th Cir. 2002) (internal citations and quotations omitted).

Further, "[b]ecause naked licensing is generally ultimately relevant only to establish an unintentional trademark abandonment which results in a loss of trademark rights against the world, the burden of proof faced by third parties attempting to show abandonment through naked licensing is stringent." *Exxon Corp.,* 109 F.3d at 1075-76.

1. Fuel's Agreement with Fuel TV, Inc.

Fuel's settlement agreement with Fuel TV, Inc. ("Fuel TV") arose out of litigation filed in the Central District of California in which Fuel TV and Fuel asserted trademark infringement claims for the respective use of "Fuel" by each party.  ECF No. 83 at 14.  The terms of the settlement agreement between Fuel and Fuel TV prohibit Fuel TV from using the "Fuel" mark alone and require Fuel TV's use of the "Fuel" mark to be in conjunction with the word "TV" or "Television."  ECF No. 84 at 15.  The agreement also requires Fuel TV to pay Fuel a fee for wearables sold by Fuel TV bearing the "Fuel TV" or "Fuel Television" mark.  *Id.* at 15.  The agreement further prohibits Fuel from entering the media business using the "Fuel" mark.  *Id.*

Nike contends that this agreement is a license to use the "Fuel" mark.  ECF No. 68-1 at 26. Nike further contends that because the agreement contains no quality control provisions and Fuel has exercised no actual quality control over Fuel TV, the agreement is properly classified as a naked license.  ECF No. 68-1 at 26.  In response, Fuel contends that no exercise of quality control is necessary because the agreement between Fuel and Fuel TV is not a license to use the "Fuel" mark but instead restricts the use of the "Fuel" mark.  ECF No. 83 at 15.

8

Based on the terms of the settlement agreement, the court finds that a reasonable jury could interpret the agreement to restrict Fuel TV's use of the "Fuel" mark and thus prevent an infringing use of the mark. *See Exxon Corp.*, 109 F.3d at 1076 ("Determining whether or not a particular agreement risks the possibility of allowing an infringing use of the mark, *i.e.,* a use that creates a likelihood of consumer confusion, is, like the entirety of [the defendant's] abandonment claim, ordinarily a factual inquiry."). This interpretation would preclude the agreement from being classified as a license. Further, to the extent Nike presents evidence of both Mr. Gould and Fuel's counsel referring to the Fuel TV agreement as a "license," these references are not dispositive of the legal nature of the agreement. *See Halo Mgmt., LLC v. Interland, Inc.*, C-03-1106 MHP, 2004 WL 1781013, at *4 n.10 (N.D. Cal. Aug. 10, 2004) (recognizing that the legal nature of an agreement cannot be changed by "calling it . . . something else").

As such, the court finds that issues of fact exist as to whether the agreement between Fuel and Fuel TV is properly classified as a license. Pursuant to this finding, the court need not consider whether Fuel exercised sufficient quality controls at this stage.

2. Fuel's Agreement with Safari Shirt Company

Fuel's settlement agreement with Safari Shirt Company ("Safari Shirt") resulted from a trademark infringement proceeding in the District of Oregon arising out of Safari Shirt's operation of retail locations named "Fuel." ECF No. 83 at 16. The settlement agreement requires Safari Shirt to attempt to cease all use of the "Fuel" mark by August 9, 2007. ECF No. 71-17 at 4. If such use continued beyond August 9, 2007, the agreement provides that Safari Shirt pay a monthly fee for each month of continued use up until February 8, 2008. *Id.* The agreement further provides that if Safari Shirt's use continued beyond February 8, 2008, the monthly fee would increase until such use

9

ceased or until August 9, 2008. *Id.* By August 9, 2008, the agreement provides that Safari Shirt must cease all use of the "Fuel" mark entirely. *Id.*

Nike contends that Fuel's agreement with Safari Shirt is a license to use the "Fuel" mark that contains no quality control provisions. ECF No. 68-1 at 28. Further, Nike contends that Fuel has not exercised any actual quality control over Safari Shirt. *Id.* In response, Fuel contends that its agreement with Safari Shirt is not a license but is instead an agreement for Safari Shirt to stop using the "Fuel" mark entirely. ECF No. 83 at 16. To facilitate this result, Fuel contends that the agreement provided for a phase-out period during which Safari Shirt would cease its use of the "Fuel" mark. *Id.*

Based on the terms of the agreement, the court finds that a reasonable jury could interpret the agreement as a "phase-out" agreement serving the purpose of discontinuing Safari Shirt's use of the "Fuel" mark. Indeed, courts have recognized that certain agreements containing phase-out provisions are not naked licenses. *See Exxon Corp.*, 109 F.3d at 1076-78 (rejecting the defendant's argument that "phase-out" agreements between the plaintiff an other infringers constituted naked licenses). This interpretation would preclude the agreement from being classified as a license.

Nike contends that recent communications between Fuel's counsel and Safari Shirt indicate that Safari Shirt continued to use the "Fuel" mark beyond August 9, 2008, evidencing that the agreement is not a "phase-out" agreement but a license. However, Fuel contends that these communications address a 2005 trademark application by Safari Shirt for the phrase "WHAT FUELS YOU?" that Safari shirt is no longer pursuing and not using in any way. ECF No. 83-4 at 2. After considering the communications between Fuel and Safari Shirt in the record, the court finds that the communications further evidence issues of fact surrounding whether the agreement is a license.

10

As such, the court finds that issues of fact exist as to whether the agreement between Fuel and Safari Shirt Company is properly classified as a license. Pursuant to this finding, the court need not consider whether Fuel exercised sufficient quality controls at this stage.

3. Fuel's Agreement with Fuel Helmets, Inc.

Fuel's agreement with Fuel Helmets, Inc. ("Fuel Helmets") resulted from negotiations between the parties independent of any legal proceeding. Fuel Helmets is the owner of a trademark for "Fuel" in International Class 9 for motorcycle helmets while Fuel is the owner of a trademark for "Fuel" in International Class 25 for clothing. ECF No. 72-2 at 3. The agreement between the Fuel and Fuel Helmets, tilted "Consent Agreement," requires Fuel Helmets to cease use of the "Fuel" mark as a component of any mark in connection with the advertising or sale of clothing or helmets for off-road use. *Id.* at 4. The Consent Agreement allows Fuel Helmets to continue use of the "Fuel" mark as a component of any mark in connection with the advertising or sale of safety helmets, motorcycle gloves, and related products for on-road use. *Id.*

Nike contends that this agreement is a license to use the "Fuel" mark that contains no quality control provisions. ECF No. 68-1 at 27. Further, Nike contends that Fuel has not exercised any actual quality control over Fuel Helmets. *Id.* In response, Fuel contends that no quality control is necessary, as its agreement with Fuel Helmets is not a license but is instead a co-existence or consent-to-use agreement whereby each party agreed to use "Fuel" only in their respective fields – Fuel Helmets for on-road use and Fuel for off-road use. ECF No. 83 at 17.

Based on the terms of the Consent Agreement, the court finds that a reasonable jury could interpret the agreement to function not as a license of Fuel's mark but instead as a consent-to-use agreement that "fixes and defines the existing trademark[s] of [Fuel and Fuel Helmets] . . . [so] that

confusion and infringement may be prevented." *See Exxon Corp.,* 109 F.3d at 1076 (5th Cir. 1997). This interpretation would preclude the agreement from being classified as a license.

As such, the court finds that issues of fact exist as to whether the agreement between Fuel and Fuel Helmets, Inc. is properly classified as a license. Pursuant to this finding, the court need not consider whether Fuel exercised sufficient quality controls at this stage.

### 4. Naked Licensing Conclusion

With respect to Fuel's agreements with Fuel TV, Fuel Helmets, and Safari Shirt, the court finds that "issues of fact preclude a determination of whether, and to what degree, [Fuel] issued naked licenses." *See Kebab Gyros, Inc. v. Riyad*, 3:09-0061, 2009 WL 5170194, at *11 (M.D. Tenn. Dec. 17, 2009). Accordingly, the court denies Nike's motion for summary judgment to the extent Nike seeks summary judgment as to all of Fuel's claim based on the affirmative defense of abandonment through naked licensing.

**B.    *Likelihood of Confusion***

In addition to its naked licensing arguments, Nike also moves for summary judgment as to Fuel's federal trademark infringement, common law trademark infringement and unfair competition, federal unfair competition and false designation of origin, and SCUTPA claims, contending that there is no likelihood of confusion among relevant consumers. Fuel's federal trademark infringement claims arise under the Lanham Act, 15. U.S.C. §§ 1051, et seq. ECF No. 1 at 1. In order to prevail on claims of trademark infringement and unfair competition under the Lanham Act, a plaintiff is obliged to show the court that "it ha[d] a valid, protectible trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 170 (4th Cir. 2006). In that regard,

"the ultimate question, for purposes of determining liability in trademark infringement actions, is whether there exists a likelihood that an appreciable number of ordinarily prudent purchasers will be misled, or indeed simply confused, as to the source of the goods in question." *Perini Corp.*, 915 F.2d at 127 (internal quotations omitted). With respect to likelihood of confusion, summary judgment is appropriate "if, based on the undisputed facts in the summary judgment record, no reasonable jury could find a likelihood of confusion." *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.* (*Renaissance I*), 405 F. Supp. 2d 680, 690 (E.D. Va. 2005), *aff'd*, 227 F. App'x 239 (4th Cir. 2007).

The Fourth Circuit has articulated nine factors generally relevant to the "likelihood of confusion" inquiry: (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public. *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 153 (4th Cir. 2012). "These factors are not always weighted equally, and not all factors are relevant in every case." *Id.* (internal quotations omitted). Rather, "the confusion factors are only a guide—a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion," and "there is no hard and fast rule that obligates the district court to discuss each non-mandatory factor." *Id.* at 154 (internal citations and quotations omitted). Instead, in assessing whether confusion exists, the court must "look to how the two parties actually use their marks in the marketplace to determine whether

13

the defendant's use is likely to cause confusion." *Carefirst of Maryland, Inc. v. First Care P.C.*, 434 F.3d 263, 267 (4th Cir. 2006).

Although summary judgment on likelihood of confusion is permissible in appropriate cases, "determining the likelihood of confusion is an inherently factual issue that depends on the facts and circumstances in each case." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 933 (4th Cir.1995) (internal quotations omitted). Indeed, the Fourth Circuit has noted that the issue of confusion is "particularly amenable to resolution by a jury" as "the jury, which represents a cross-section of consumers, is well-suited to evaluating whether an 'ordinary consumer' would likely be confused." *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992).

Fuel contends that evidence of both forward confusion and reverse confusion is present in this case. As a threshold matter, "[b]oth reverse and forward confusion cases require the plaintiff to demonstrate a likelihood of confusion among consumers." *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1079 (9th Cir. 2005). However, forward confusion occurs when "the junior user attempts to trade on the senior's user's goodwill and reputation." *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.* (*Coryn I*), CIV WDQ-08-2764, 2010 WL 1375301, at *4 n.10 (D. Md. Mar. 30, 2010). In such a scenario, "customers mistakenly think that the junior user's goods or services are from the same source as or are connected with the senior user's goods or services." 4 McCarthy on Trademarks and Unfair Competition § 23:10 (4th ed.). In contrast, reverse confusion "occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user." *Coryn I*, 2010 WL 1375301, at *4 n.10. While "the junior user does not seek to profit from the goodwill associated with the senior user's mark," "the senior user is injured because the public comes to assume that the senior user's products are really the junior user's." *Id.*

14

Because Fuel contends that both forward confusion and reverse confusion are applicable in this case, the court will consider both theories of confusion.

    1. <u>Forward Confusion</u>

**a. The Strength or Distinctiveness of Plaintiff's Asserted Mark**

The first likelihood of confusion factor focuses on the strength of the mark. The strength of a trademark is determined by "the degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source." *Carefirst*, 434 F.3d at 269. The strength of a mark is "evaluated in terms of its conceptual strength and commercial strength." *Id.* A court should measure a mark's conceptual strength by focusing on "the linguistic or graphical 'peculiarity' of the mark . . . considered in relation to the product, service, or collective organization to which the mark attaches." *Synergistic Int'l, LLC*, 470 F.3d at 173 (citing *Carefirst*, 434 F.3d at 269). By contrast, the commercial-strength inquiry "looks at the marketplace and asks 'if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise.'" *Carefirst*, 434 F.3d at 269 (citing *Perini Corp.*, 915 F.2d at 125). Of these two considerations, commercial strength "is more important, because a conceptually weak but commercially strong mark can still gain protection through secondary meaning, as illustrated by such examples as AMERICAN Airlines, PAYLESS Drug Stores and KENTUCKY FRIED CHICKEN . . . [while] a conceptually strong mark that is relatively unknown in the marketplace will not be likely to cause any confusion among consumers of other products." *Renaissance I*, 405 F. Supp. 2d at 690-91.

    1. *Conceptual Strength*

A mark's conceptual strength is determined in part by its placement into one of the following

four groups, which are presented in ascending order of strength or distinctiveness: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful.  *George & Co. LLC v. Imagination Entm't Ltd.* (*George II*), 575 F.3d 383, 394 (4th Cir. 2009).  A generic mark "describes a product in its entirety" but "neither signifies the source of goods nor distinguishes the particular product from other products on the market" and is therefore "never entitled to trademark protection." *Id.* at 394 (internal citations and quotations omitted).  A descriptive mark "define[s] a particular characteristic of the product in a way that does not require any exercise of the imagination" and is "not inherently distinctive . . . [but] rather . . . require[s] a showing of secondary meaning before [it] receive[s] trademark protection." *Id.*  A suggestive mark is "inherently distinctive" and does "not describe a product's features but merely suggests them," meaning that "the exercise of some imagination is required to associate a suggestive mark with the product." *Id.*  A fanciful mark is "inherently distinctive" and "typically involve[s] made-up words created for the sole purpose of serving as a trademark." *Id.*  Finally, an arbitrary mark is "inherently distinctive" and typically involves common words that have no connection with the actual product, as "they do not suggest or describe any quality, ingredient, or characteristic, so the mark can be viewed as arbitrarily assigned." *Id.* (internal quotations omitted).

Nike contends that Fuel's mark is a descriptive mark entitled to a narrow scope of protection. In support of this contention, Nike cites to instances in which Fuel has used its mark in a descriptive context, including emails sent from Mr. Gould's business account in which Mr. Gould uses phrases such as "keep fueling the fire" and "Powered by Fuel" as well as an advertisement from the Fuel Facebook page in which the phrase "Whats [sic] Your Fuel?" is displayed over a picture of a motocross rider. *See* ECF Nos. 70-8; 70-9 at 2.  However, Fuel contends that its mark is not

descriptive and offers Mr. Gould's statement that when he chose the name "Fuel" for a mark, it was "not to describe or suggest anything that would burn." ECF No. 83-1 at 2. A consideration of the "Fuel" mark supports the conclusion that the mark is not a descriptive mark, as "Fuel" does not define a particular characteristic of action sports apparel. Instead, the Fuel mark is at least suggestive and therefore inherently distinctive.

However, this designation does not resolve the mark's conceptual strength. Instead, the court must also consider the use of the mark by third parties. "A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *See CareFirst*, 434 F.3d at 270. Indeed, "the frequency of prior use of [a mark's text] in other marks, particularly in the same field of merchandise or service, illustrates the mark's lack of conceptual strength." *Id.* (internal quotations omitted). Still, "just as the widespread prevalence of [a] mark diminishes its distinctiveness, so the successful policing of a mark adds to its strength to the extent that it prevents weakening of the mark's distinctiveness in the relevant market." *Renaissance I,* 405 F. Supp. 2d at 692 n.15.

Here, the record reveals substantial third-party use of the "Fuel" mark. Nike presents evidence that over 1,000 federal trademark registrations exist including the word "Fuel" as part of, or in conjunction with, other words, with at least 15 of these registrations in International Class 25, the same class as Fuel's '931 Registration. ECF No. 71-2. Nike also provides numerous Internet printouts depicting non-party use of the word "Fuel" in connection with the promotion of apparel and sports-related equipment and services.[1] ECF Nos. 71-2 & 71-3. Further, Nike provides evidence

---

[1]    The court notes that Fuel objects to the use of these Internet printouts as evidence, arguing that Nike cannot rely on the Internet printouts without presenting evidence of actual use relating to the businesses. However, the court finds that the Internet

of at least 22 federal trademark registrations for the word "fuel" alone.  ECF Nos. 71, 71-1.  These 22 registrations for the word "fuel" alone include registrations in connection with bicycles, sporting goods including softball and baseball bats, watches and jewelry, protective eyewear, and motorcycle helmets.  ECF No. 71 at 4-19.

Fuel contends that these registrations do not weaken the conceptual strength of its mark, as none of the registrations cited by Nike are in the field of action sports.  ECF No. 83 at 24.  However, 15 of the registrations are in the same class as Fuel's '931 Registration.  Further, with regard to the 22 trademark registrations for the word "Fuel" alone, some of these registrations are in connection with bicycles, sporting goods, motorcycle helmets, and watches and jewelry, each of which could be interpreted to encompass the action sports field.  *See JL Beverage Co., LLC v. Beam*, *Inc.*, 899 F. Supp. 2d 991, 1000 (D. Nev. 2012) ("When considering whether the senior mark is weakened by its presence in a crowded field of similar marks, the relevant field is a field which at least broadly would include or be related to [the] plaintiff's business.") (internal quotations omitted).  Additionally, the non-party use of "Fuel" depicted in Internet printouts in connection with apparel products, even those unrelated to the action sports market, weakens the distinctiveness of Fuel's asserted mark.  *See Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.* (*Renaissance II*), 227 F. App'x 239, 243 (4th Cir. 2007) ("[E]vidence of third-party use of a mark in unrelated markets—although not as persuasive as use within the same product class—indicates a mark's lack of conceptual strength.").

---

printouts are relevant evidence regarding the strength of the mark.  *See U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 525 (4th Cir. 2002) (considering "web-page print-outs" from several other businesses in determining that an asserted mark was descriptive); *CareFirst*, 434 F.3d at 270 (finding substantial third-party use was demonstrated in part by web page print-outs of other businesses using the mark).

Further, while "a mark weakened by third-party use may be rehabilitated by evidence of successful policing of the mark," such evidence must be "demonstrated by actual name changes in the marketplace, which lessens the diluting effect of third-party use." *Scurmont LLC v. Firehouse Rest. Grp., Inc.*, 4:09-CV-00618-RBH, 2011 WL 2670575, at *14 (D.S.C. July 8, 2011). Here, Fuel has provided evidence of litigation proceedings against five separate companies and consent agreements with numerous other companies regarding allegedly infringing use of its mark. ECF No. 83 at 28. However, this evidence is only relevant "to the extent that it prevents weakening of the mark's distinctiveness in the relevant market." *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 139 (2d Cir. 1999). While the court recognizes that evidence of Fuel's policing efforts supports the prevention of the weakening of its mark, the policing evidence provided is not strong enough to completely overcome the widespread third-party use of the mark in both related and unrelated markets. As such, while the court acknowledges that the mark is at least suggestive and therefore inherently distinctive, the court finds that the mark's conceptual strength is slightly weakened by frequent third-party use of the mark.

2. *Commercial Strength*

While the conceptual strength of Fuel's mark may be weakened by third-party usage of the mark across a variety of markets, the court must also consider the commercial strength of the mark. The Fourth Circuit has set forth the following factors to consider in assessing commercial strength: (1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark. *Perini Corp.*, 915 F.2d at 125.

A consideration of these factors supports a finding that Fuel's mark is commercially weak. With regard to the first and third factors, advertising expenditures and sales success, "it is appropriate to consider the sales and advertising expenditures of the product or products bearing the trademark at issue relative to those of other trademarks in the market." *Renaissance I,* 405 F. Supp. 2d at 694. The record indicates that Fuel's total advertising expenses since 1993 average less than $20,000 a year. ECF No. 70-5 at 2-3. The record further indicates that Fuel operated at a loss during 14 of the 19 years for which Fuel produced financial records, accumulating over $1 million in losses and approximately $500,000 in profits during this time. *See* ECF No. 70-4 at 2-5. The record also indicates that over the last 11 years, Fuel's revenues have averaged slightly over $300,000 a year. *Id.* at 2-3.

Nike contends that these figures are *de minimis* in relation to the overall sports industry and support a finding that Fuel's mark is commercially weak. ECF No. 68-1 at 34. However, Fuel contends that the figures do not evidence weakness, as Nike fails to provide context by comparing these figures to the overall action sports industry. ECF No. 83 at 26. However, it is "the trademark owner" who "should put its sales and advertising figures in perspective by comparing them to the sales and advertising figures for similar products to show that this mark is used on a leading product in its category." 4 McCarthy on Trademarks and Unfair Competition § 11:83 (4th ed.). Here, Fuel has not provided any evidence of advertising or sales figures for similar products. As such, the evidence in the record concerning advertising and sales figures does not support a finding that the mark is commercially strong. *See Renaissance I,* 405 F. Supp. at 693 ("[W]hile evidence of advertising and sales is relevant to prove the strength of a mark, standing alone without a context, such evidence may not be sufficient to prove that a mark is very strong"); *Cont'l Lab. Prods., Inc.*

*v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1004 (S.D. Cal. 2000) (finding a trademark owner failed to raise a genuine issue regarding secondary meaning of its mark when it failed to "explain how its alleged sales success has any relationship to the attainment of secondary meaning in the minds of the consuming public, nor [did] it provide any evidence that could permit a reasonable jury, without engaging in speculation and conjecture, to draw such an inference"). In that regard, the first and third factors do not support a finding of commercial strength. *See Fossil Inc. v. Fossil Grp.*, 49 U.S.P.Q.2d 1451 (T.T.A.B. Oct. 30, 1998) ("If a party plaintiff in a [Trademark Trial and Appeal] proceeding is to rely simply on sales and advertising figures in an effort to establish that its mark is famous, then it is incumbent upon that party plaintiff to place the sales and advertising figures in context . . . [r]aw sales and advertising figures—unless they are extraordinarily large . . . are simply not sufficient by themselves to establish that the mark is famous.").

With regard to the second factor, consumer studies, it is well-recognized that "[c]onsumer studies that link the mark to its source are generally thought to be the most direct and persuasive way of establishing . . . commercial strength." *Coryn Group II, LLC v. O.C. Seacrets, Inc.* (*Coryn II*), 868 F. Supp. 2d 468, 486 n.17 (D. Md. 2012). Here, Fuel did not perform any consumer studies. Courts have recognized that a "lack of [consumer studies] does not automatically defeat [a finding] commercial strength." *Id.* Thus, Fuel's failure to provide any consumer studies is not dispositive of a lack of commercial strength, as the other relevant factors must be considered as well. However, because Fuel did not provide any consumer studies, this factor does not support a finding of commercial strength. *See id.*

With regard to the fourth factor, unsolicited media coverage, Fuel has provided evidence of unsolicited media coverage obtained through "[a]n Internet search of Fuel Clothing Company and

its owner Shane Gould."[2]  ECF No. 83 at 27.  As a threshold matter, Nike contends that because Fuel did not provide this media coverage during the course of discovery, it cannot be used to defeat summary judgment.  *See Contech Stormwater Sols., Inc. v. BaySaver Techs., Inc.*, 534 F. Supp. 2d 616, 622 (D. Md. 2008) ("When a party 'fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.'").  However, even assuming that Fuel's failure to provide the media coverage during discovery was harmless or justified, the court finds that the minimal media coverage provided by Fuel does not support a finding of commercial strength.  *See George II*, 575 F.3d at 396 (upholding a finding of no likelihood of confusion where the trademark holder "enjoyed some unsolicited media attention"); *Connecticut Cmty. Bank v. The Bank of Greenwich*, 578 F. Supp. 2d 405, 414 (D. Conn. 2008) (finding this factor to weigh against a finding of secondary meaning when the trademark holder "offered little evidence of unsolicited media coverage").  As such, the fourth factor does not support a finding of commercial strength.

With regard to the fifth factor, attempts to plagiarize the mark, Nike contends that "there is no evidence of attempts to plagiarize the Asserted Mark."  ECF No. 68-1 at 36.  However, Fuel has provided evidence of litigation proceedings against five separate companies and consent agreements with numerous other companies regarding allegedly infringing use of the "Fuel" mark.  ECF No. 83 at 28.  As such, this factor supports a finding of commercial strength.  *See Venetian Casino Resort,*

---

[2]    Specifically, Fuel provides six unsolicited media articles from business.transworld.net, Malakye.com, hiltonheadmonthly.com, celebratehiltonhead.com, theskichannel.com, and Bossstart.com.  ECF No. 83-1 at 15-31.

*LLC v. Venetiangold.com*, 380 F. Supp. 2d 737, 743 (E.D. Va. 2005) (finding support for commercial strength where the plaintiff cited "at least two examples where [it] has prevailed in fending off persons who were plagiarizing or infringing on its marks").

With regard to the sixth factor, the length and exclusivity of the plaintiff's use of the mark, the court recognizes that Fuel has used its mark since 1992. However, as previously discussed with regard to conceptual strength, numerous third-party uses of the "Fuel" mark weaken the mark's commercial strength. *See CareFirst*, 434 F.3d at 270 (finding that "evidence of extensive third-party use" demonstrated the disputed mark's lack of commercial strength). As such, this factor does not support a finding of commercial strength.

Notwithstanding evidence of unsolicited media coverage and attempts to plagiarize the mark, "the record does not disclose that a substantial number of present or prospective customers, when hearing or reading of [the Fuel mark], would associate [the Fuel mark] specifically with [Fuel]." *See George II*, 575 F.3d at 395-96 (finding a lack of commercial strength where the plaintiff's advertising expenditures were minimal, no consumer studies were performed, there was no evidence of attempts to plagiarize the mark, but the plaintiff enjoyed some unsolicited media attention and recent sales success). This lack of commercial strength "renders the [Fuel] mark weak for the purposes of [the court's] strength of the mark analysis." *See id.*

Accordingly, the court finds that while Fuel's mark has some conceptual strength, its commercial weakness in combination with the widespread third-party use of the mark necessitates a finding that a consumer would not associate the "Fuel" mark specifically with Fuel. *See Carefirst*, 434 F.3d at 269 ("The strength of a mark is the degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source");

23

*Renaissance I*, 405 F. Supp. 2d at 694 (finding that "the mark's commercial weakness, in combination with the wide use of [the mark] in other products" compelled the conclusion that the mark is weak, such that "its ability to identify the source of products does not extend beyond [its market]"). In that regard, the court finds that Fuel's mark is a weak mark. As such, the first likelihood of confusion factor, the strength of the mark, weighs against a finding of likelihood of confusion.

### b. The Similarity of the Two Marks to Consumers

The second likelihood of confusion factor focuses on the similarity of the two marks at issue. In assessing the similarity of two marks, the Fourth Circuit has directed that district courts "focus on the dominant portion of the parties' marks" and consider "whether there exists a similarity in sight, sound, and meaning which would result in confusion." *George II*, 575 F.3d at 396. In so doing, courts must examine the "allegedly infringing use in the context in which it is seen by the ordinary consumer." *Swatch, S.A. v. Beehive Wholesale, LLC,* 888 F. Supp. 2d 738, 749 (E.D. Va. 2012).

Fuel uses its mark in a variety of formats on a wide range of apparel and accessories in the action sports industry. *See* ECF Nos. 70-10, 70-11. These uses of the "Fuel" mark incorporate various colors, designs, shapes, and fonts. *See id.* In some instances, Fuel uses its mark in conjunction with other images, such as a flame or a skull, or in conjunction with phrases, such as "Powered by Fuel." *See id.* By comparison, Nike uses the "Fuel" mark in conjunction with its "NIKE+FUELBAND" and "NIKEFUEL" marks. Nike also uses the "Fuel" mark alone on the scrolling display screen of the NIKE+FUELBAND. ECF 68-1 at 16. An image of the "Fuel" mark on this scrolling display screen also appears on the packaging for the NIKE+FUELBAND, with the

24

"NIKE+FUELBAND" mark directly below the image of the band and the "swoosh" mark directly above the image. *Id.* Nike also uses "Fuel" on promotional t-shirts for the NIKE + FUELBAND in descriptive phrases such as "Fuel it up," "Fuel the People," and "Fuel this." *Id.* Each t-shirt also bears the Nike "swoosh" mark on the lower front and the "NIKE+FUELBAND" mark on the back. *Id.* at 17-18.

Based on these uses, Nike contends that the two marks are not similar, as Nike uses "Fuel" as part of a compound brand name, as in NIKE+FUELBAND and NIKEFUEL, or in combination with the "NIKE" house mark or "swoosh" mark. ECF No. 68-1 at 37. The evidence in the record indicates that the instances in which "Fuel" appears "alone," meaning without being directly preceded or followed by "NIKE" or "BAND," are limited to the following three circumstances: (1) the scrolling display of "Fuel" in reference to NikeFuel points on the display screen of the NIKE+FUELBAND; (2) an image of the "Fuel" mark on the display screen of the band found on the packaging for the NIKE+FUELBAND; and (3) the use of "Fuel" on promotional t-shirts in various descriptive phrases, including "Fuel the People." ECF No. 68-1 at 16-18. However, in each of these three instances, the "Fuel" mark is accompanied by the "NIKE" house mark, the "swoosh" mark, or the "NIKE+FUELBAND" mark.

When considering the similarity of two marks, "[i]f one of two similar marks is commonly paired with other material, that pairing will serve to lessen any confusion that might otherwise be caused by the textual similarity between the marks." *Carefirst*, 434 F.3d at 271. Further, "[t]his effect is most significant when . . . the allegedly infringed mark . . . has little independent strength." *Id.* As previously discussed with regard to the first factor, the "Fuel" mark is a weak mark. Because Fuel's mark is weak, consumers encountering the "Fuel" mark on one hand and "Fuel" used in

pairing with the "NIKE" or the "swoosh" mark on the other "are more likely to focus on the differences between the two, particularly when the most salient difference—the addition of [NIKE]—is itself a prominent mark." *See id.* Thus, because Nike's use of "Fuel" is always paired with the "NIKE" house mark, the "swoosh" mark, or the "NIKE+FUELBAND" mark, "the substantial differences in the public presentations of [the two marks] significantly reduce the likelihood of confusion, notwithstanding their textual similarity." *Id.* at 272.

These differences are also apparent in the manner in which the two marks are branded and packaged. *See George II*, 575 F.3d at 395 (finding two marks to be dissimilar based in part on the "totally different" packaging and branding of the two marks). The "Fuel" mark appears fleetingly on the scrolling display screen of the NIKE+FUELBAND and permanently on the NIKE+FUELBAND packaging and promotional t-shirts. ECF No. 68-1 at 16-18. In contrast, Fuel uses its "Fuel" mark in a variety of formats on a variety of action sports apparel and accessories and, in some instances, uses its mark in conjunction with another design, including a skull or a flame. *Id.* at 6. A consideration of the uses of the two marks indicates that "the manner in which the marks are used on their respective packaging distinguishes the two marks beyond doubt." *George II*, 575 F.3d at 396.

Accordingly, the court finds that the consistent use of Nike's marks in combination with the "Fuel" mark along with the different presentation and packaging of the marks diminishes the likelihood of confusion that would otherwise be caused by the textual similarity of the marks. *See Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 94 (4th Cir 1997) (finding two uses of the mark "Petro" were not similar based on the marks' different colors, accompanying

26

words, and graphics).  As such, the second likelihood of confusion factor, the similarity of the two

marks to consumers, weighs against a finding of likelihood of confusion.

### c.  The Similarity of the Goods or Services that the Marks Identify

With respect to the third likelihood of confusion factor, the similarity of the goods or services

identified by the marks, "the goods in question need not be identical or in direct competition with

each other" because "confusion may arise even where products are merely related."  *Swatch, S.A.,*

888 F. Supp. 2d at 751-52.  In considering the similarity of goods or services, a court must "measure

the similarity . . . with respect to each party's actual performance in the marketplace."  *CareFirst*,

434 F.3d at 272.

Nike contends that the NIKE+FUELBAND is a consumer electronic product "unlike any

product [Fuel] has ever sold, currently sells, or plans to sell."  ECF No. 68-1 at 38.  Nike stresses that

Fuel has never sold, does not currently sell, and has no plans to sell consumer electronic products.

*Id.* at 39.  Further, Nike contends that its t-shirts bearing the "Fuel" mark were "merely promotional

items that directly relate to the [NIKE+FUELBAND] and are unlikely to cause confusion." *Id*. at 38.

In response, Fuel contends that the goods at issue are directly competitive, as they consist of t-shirts

and wristbands bearing the word "Fuel," just as Fuel sells t-shirts and wristbands bearing the word

"Fuel."  ECF No. 83 at 33-34.

With respect to the NIKE+FUELBAND, the band is an electronic device worn on the wrist

that calculates daily activity and sells for roughly $149.00.  ECF 68-1 at 15-16.  The only evidence

in the record of a wristband sold by Fuel is a leather wristband with no electronic component ranging

in price from $16.00 to $26.00.  *Id.* at 5.  Mr. Gould's deposition testimony indicates that Fuel has

never sold consumer electronic products and it is "not something [Mr. Gould] is looking to do."

ECF No. 69-2 at 57.[3]  In addition to differing in their functions, the NIKE+FUELBAND and Fuel's wristbands differ in appearance, with the former consisting of a thin rubberized band with an electronic display screen and the latter consisting of a thicker, leather band with no electronic capabilities.  *See* ECF No. 68-1 at 16, ECF No. 70-6 at 2.  Thus, the differences between the NIKE+FUELBAND and Fuel's wristband in both function and appearance indicate that the goods are not likely to cause confusion in actual consumers.  *See IDV N.A., Inc. v. S & M Brands, Inc.*, 26 F. Supp. 2d 815, 826 (E.D. Va. 1998) ("Differences in the goods on which the marks appear are probative of the absence of the likelihood of confusion.").

Further, with respect to the NIKE+FUELBAND promotional t-shirts, while the promotional t-shirts share similarities with the t-shirts sold by Fuel, the relevant inquiry with regard to the similarity of the goods requires a consideration of "each party's actual performance in the marketplace."  *CareFirst*, 434 F.3d at 272.  Undisputed evidence in the record indicates that the promotional t-shirts sold by Nike in connection with the launch of the NIKE+FUELBAND "amount to less than one-percent of all [NIKE+FUELBAND] sales" and "over two-thirds of all promotional

---

[3]    The court notes that Mr. Gould's Declaration attached to Fuel's Response in Opposition to Nike's summary judgment motion indicates that Mr. Gould is "considering making and selling rubberized Fuel wristbands in different colors, which would display . . . 'Fuel' alone in some form or print, or even LED lighting." ECF No. 83-1 at 4.  However, the court finds this contention is not sufficient to raise a genuine issue of fact with regard to the similarity of the goods, as Fuel has produced no evidence of this plan beyond Mr. Gould's own declaration despite opportunities for Mr. Gould to address this plan during his deposition.  *See Larkin v. Perkins*, 22 F. App'x 114, 115 (4th Cir. 2001) (affirming a district court's determination that a "self-serving affidavit containing conclusory assertions and unsubstantiated speculation" was "insufficient to stave off summary judgment"); *Survivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005) (finding the plaintiff's expressed "interest in expanding his product line" was "mere speculation" because the plaintiff failed "to adduce any concrete evidence of expansion plans").

[t-shirt] sales occurred within six months after the release of the [NIKE+FUELBAND] product." ECF No. 68-1 at 18. Because Nike's actual use of the promotional t-shirts is limited, the similarities between the t-shirts cannot overcome the dissimilarities between the NIKE+FUELBAND and Fuel's wristbands. *See Anheuser-Busch, Inc.,* 962 F.2d at 319 ("The statutory standard for infringement does not depend on how closely a fragment of a given use duplicates the trademark, but on whether the use in its entirety creates a likelihood of confusion.").

Accordingly, the court finds that each party's actual performance in the marketplace indicates that the goods at issue are dissimilar. As such, the third likelihood of confusion factor, the similarity of the goods or services that the marks identify, weighs against a finding of likelihood of confusion.

### d. The Similarity of the Facilities Used by the Markholders

The fourth likelihood of confusion factor, the similarity of the facilities used by the markholders, seeks " to determine if confusion is likely based on how and to whom the respective goods of the parties are sold." *Rosetta Stone Ltd.*, 676 F.3d at 155 (internal quotations omitted). "[W]hen there are basic differences between plaintiff's and defendant's modes of distributing their products, this factor does not favor the plaintiff." *Swatch, S.A.* 888 F. Supp. 2d at 752 (internal quotations omitted). Nike contends that its NIKE+ FUELBAND is sold "exclusively through NIKE and APPLE" and its promotional t-shirts are sold "through NIKE and other large retailers–none of which sell[s] [Fuel's] products."[4] ECF No. 68-1 at 40. Fuel's products are sold through its own retail location on Hilton Head Island, South Carolina, as well as through outlet locations, small independent retail shops, and Internet websites, including its own website and Amazon.com. ECF

---

[4]    These retailers include TJX Companies, Inc., Ross Stores, Inc., Academy Corp., Sports Authority, Inc., and Marshalls. *See* ECF No. 69 at 2.

No. 83 at 34. Fuel contends that it uses "similar distribution channels" as Nike because both companies sell products through retail locations and through the Internet. Further, Fuel notes that the NIKE+FUELBAND is available for purchase on Amazon.com, the same website on which Fuel's products are available for purchase.[5] ECF No. 83 at 9.

Although there are some similarities between the facilities used by Nike and Fuel, the court finds that these similarities are not significant. The NIKE+FUELBAND is sold exclusively through Nike and Apple stores and websites, and the promotional t-shirts are sold by Nike and other large retailers, none of which sell Fuel's products. *See Swatch, S.A.,* 888 F. Supp. 2d at 753 (finding that despite the plaintiff and defendant both selling products in department stores, over the Internet, and in gift stores, any overlap was insignificant, as the parties did not sell products at the same stores or through the same Internet websites and the gift store sales were not significant). Accepting Fuel's contention that the NIKE+FUELBAND is sold by Nike through Amazon.com, the court finds any overlap through sales on Amazon.com to be *de minimis*. *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 263 (4th Cir. 2007) ("Louis Vuitton II") (finding that even where the plaintiff's and the defendant's products were sold at the same Macy's department store, the lack of general overlap in facilities "is so minimal as to be practically non-existent" when all other distribution channels differed).

Accordingly, because the evidence indicates that Nike and Fuel use different distribution channels with little overlap, no issues of fact exist as to the similarity of the facilities used by Nike and Fuel. Thus, the court finds the evidence of similarities of the facilities used by the parties to be

---

[5] The court notes that Nike contends that it does not itself sell the NIKE+FUELBAND through Amazon.com. However, for the purposes of summary judgment, Fuel's contention will be accepted as true.

*de minimis*.  As such, the fourth likelihood of confusion factor, the similarity of the facilities used by the markholders, weighs against a finding of likelihood of confusion.

### e.  The Similarity of Advertising Used by the Markholders

In assessing the fifth likelihood of confusion factor, a court may consider "the media used, the geographic areas in which advertising occurs, the appearance of the advertisements, and the content of the advertisements."  *CareFirst*, 434 F.3d at 273.  Nike contends that its advertising broadly targets all consumers and seeks to convey that the "[NIKE+FUELBAND] product can be used for all activities– regardless of the sport."  ECF No 68-1 at 40.  In contrast, Nike contends that Fuel limits its advertising to trade-specific publications in the action sports market, sponsorship of action sports athletes, and the Internet.  *Id.*  Fuel acknowledges that it advertises using these mediums but contends that Nike also advertises through the Internet, retail publications, action sports trade shows, and the use of professional athletes.  ECF No. 83 at 35.  Further, Fuel contends that Nike's use of a professional skateboarder to promote its NIKE+FUELBAND and Nike's promotion of its NIKE+FUELBAND at action sports trade shows indicates that the parties' advertising targets, at least in part, the same demographic. ECF No. 83 at 35.

The court finds that there are similarities between the advertising used by Fuel and Nike.  Both parties advertise through the Internet, sports publications, and action sports trade shows.  While Fuel more narrowly targets action sports consumers, there is overlap between this demographic and the broader demographic of athletes targeted by Nike.  This overlap is evidenced by Nike's use of a professional skateboarder to promote the NIKE+FUELBAND and Nike's presence and promotion of the NIKE+FUELBAND at action sports trade shows.  The court finds that a consideration of each party's methods of advertising demonstrates "enough overlap in the respective target audiences such

that a possibility of confusion could result." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.,* 508 F.3d 641, 648 (11th Cir. 2007) (internal quotations omitted). As such, the fifth likelihood of confusion factor, the similarity of the advertising used by the markholders, weighs in favor of a finding of likelihood of confusion.

### f. Defendant's Intent

The sixth likelihood of confusion factor, the defendant's intent, is often highly relevant, as intent to confuse the buying public "is strong evidence establishing likelihood of confusion." *Rebel Debutante LLC v. Forsythe Cosmetic Grp., Ltd.*, 799 F. Supp. 2d 558, 575 (M.D.N.C. 2011). This relevance is merited because "one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." *Id.* Here, Nike contends that it chose the word "Fuel" to "connote a measure of energy or power-exactly the common English meaning [Fuel] admits the word possesses." ECF No. 68 at 41. Further, Nike contends that there is no evidence that any person responsible for naming the NIKE+FUELBAND product had any knowledge of Fuel or its mark. *Id.* at 42.

In response, Fuel contends that given Nike's size, Fuel does not presume that Nike was trying to gain Fuel's goodwill by using Fuel's mark. ECF No. 83 at 35. However, Fuel notes that Nike has been trying, with difficulty, to break into the action sports market as an authentic and credible company. *Id.* As such, Fuel contends that "[a] jury can certainly find from these facts that Nike's goal in using the well established action sport name, Fuel, coupled with its emphasis on action sport advertising for the Fuel Band, demonstrates Nike's effort to trade off of Plaintiff's credibility in the action sport field." *Id.*

To further demonstrate bad faith intent, Fuel cites to the deposition of David Schriber, a Nike

32

executive responsible for the NIKE+FUELBAND. In his deposition, Mr. Schriber indicates that he was employed by Burton Snowboards from 1999 until 2003. ECF No. 83-12 at 2-3. During this time period, Mr. Gould was a professional snowboarder sponsored by Burton Snowboards and contends that he and others "wore Fuel gear while riding their Burton snowboards." ECF No. 83 at 36. Based on this overlap, Fuel contends that a jury could find that Mr. Schriber had knowledge of Fuel prior to choosing the name for the NIKE+ FUELBAND. *Id.* In his deposition, Mr. Schriber denied hearing of Fuel during his employment with Burton Snowboards. ECF No. 83-12 at 2.

The court finds that the evidence in the record does not show an intent to mislead or cause consumer confusion by Nike. Even accepting Fuel's contentions regarding Mr. Schriber's knowledge of the Fuel brand prior to naming the NIKE+FUELBAND, this evidence is not sufficient to create an issue of material fact, as "knowledge of another's goods is not the same as an intent to mislead and to cause consumer confusion." See *George II*, 575 F.3d at 398. Further, the court's earlier conclusion with respect to the strength of the Fuel mark supports a finding that Nike acted in good faith in its creation and promotion of its NIKE+FUELBAND product. *See Renaissance I*, 405 F. Supp. 2d at 697 (finding no bad faith intent where the defendant "had a reasonable basis to continue to market its gift bags under [the plaintiff's mark] because [the defendant] had a good faith belief that [the plaintiff's] mark [was] not strong enough to preclude others from using [it] for related goods").

Accordingly, the court finds that insufficient evidence exists to show bad faith intent on the part of Nike. As such, the sixth likelihood of confusion factor, the defendant's intent, weighs against a finding of likelihood of confusion.

### g. Actual Confusion

With respect to the seventh likelihood of confusion factor, actual confusion, a district court must consider whether there is evidence of "actual consumer confusion that allows the seller to pass off his goods as the goods of another." *Louis Vuitton Malletier S.A. v. Haute Diggity Dog (Louis Vuitton I), LLC*, 464 F. Supp. 2d 495, 502 (E.D. Va. 2006), *aff'd on other grounds*, 507 F.3d 252 (4th Cir. 2007). The Fourth Circuit has indicated that the actual confusion factor is "often paramount" to a likelihood of confusion analysis because "[w]hen the plaintiff's mark is strong and the defendant's use of a similar mark has actually confused the public, [a court's] inquiry ends almost as soon as it begins." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) (internal quotations omitted). However, "[t]he existence of some evidence of instances of actual confusion does not necessarily prevent the grant of a summary judgment of a dismissal for lack of a triable issue of a likelihood of confusion." *George I*, 2008 WL 2883771, at *6. Instead, actual confusion evidence "of a very limited scope may be dismissed as *de minimis*." *Id.*

"Actual confusion can be demonstrated by both anecdotal and survey evidence." *George II*, 575 F.3d at 398. With respect to survey evidence, Nike provides an actual confusion survey conducted by its expert witness, Dr. Gerald L. Ford. *See* ECF No. 69-10. Dr. Ford conducted a consumer confusion survey on both forward and reverse confusion. *Id.* Dr. Ford's survey assessed the likelihood of forward confusion from one of Nike's promotional t-shirts bearing the slogan "Fuel the People" as well as the "swoosh" mark. *Id.* at 4. Dr. Ford's forward confusion results revealed that none of the survey respondents were likely to be confused. *Id.* at 17-21. Fuel did not conduct a survey on the issue of actual confusion., but it did provide an affidavit from its expert, Jason Wolfe, in which Mr. Wolfe critiques various aspects of Dr. Ford's survey. *See* ECF 83-6 at 2-5.

34

With respect to anecdotal evidence, Fuel provides three emails and one Facebook post to illustrate actual confusion.  The first email is from Ryan Neptune, a friend of Mr. Gould's and one of Fuel's sponsored athletes.  ECF No. 68 at 21.  Mr. Neptune's email expresses concerns over Nike's promotion of its "Fuel" products, noting that Mr. Neptune's "first thought, when [he] saw the Nike 'fuel' products advertised, was that Fuel Clothing Company must have cut a deal with Nike to allow or license or authorize Nike to use Fuel's 'Fuel' trademark." ECF No. 72-11.  The second email is from Allan Brown, who Mr. Gould met in 2000 and also visited during the pendency of this case. ECF No. 69-2 at 15-16.  Mr. Brown's email expresses many of the same concerns noted in Mr. Neptune's email, including that "[Mr. Brown's] initial impression, when [he] saw the Nike 'fuel' products advertised, was that Fuel Clothing Company must have cut a deal with Nike to allow or license or authorize Nike to use Fuel's 'Fuel' trademark." ECF No. 72-12.  Mr. Brown's email further noted that "thinking back, [he recalled] that [he] figured either Fuel Clothing made a deal with Nike, which could be good for Fuel Clothing, or bad for the Fuel brand, depending on how it is used and promoted." *Id.*  The third email is from Marie Hartis, a friend of Mr. Gould's stepmother. ECF No. 68 at 22.  Ms. Hartis' email includes an article from *The Wall Street Journal* in which the NIKE+FUELBAND was highlighted as one of the "year's best products."  ECF No. 72-13.  The content of the email read "Shane I saw this bracelet in the Wall Street Journal Magazine. Pretty." *Id.*  Finally, the Facebook post from Shaun Milor, who is a friend of Mr. Gould and one of Fuel's sponsored athletes, reads "Is nike paying you royalties for the nike-fuelband [sic] im [sic] seeing advertised on facebook? Just curious . . . . " ECF No. 72-14.

The court finds that the anecdotal evidence of actual confusion offered by Fuel is insufficient to raise a genuine issue of fact with regard to actual confusion.  Courts have recognized that actual

confusion evidence from friends and family does not accurately represent the consuming public. *See Walter v. Mattel, Inc.*, 31 F. Supp. 2d 751, 760 (C.D. Cal. 1998), *aff'd*, 210 F.3d 1108 (9th Cir. 2000), *holding modified by*, *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625 (9th Cir. 2005) ("Plaintiff's evidence that a few acquaintances, friends, and family members thought that Plaintiff might be in some way associated with [the defendant] upon hearing of the [defendant's product] is not probative of a likelihood of confusion because [a]ttestations from persons in close association and intimate contact with [the senior user] . . . do not reflect the views of the purchasing public") (internal quotations omitted); *Gameologist Grp., LLC v. Scientific Games Int'l, Inc.*, 838 F. Supp. 2d 141, 162 (S.D.N.Y. 2011), *aff'd*, 508 F. App'x 31 (2d Cir. 2013) (finding actual confusion evidence presented by the plaintiff consisting of anecdotal, hearsay evidence of confusion on the part of friends and family members "does not suffice to raise a genuine issue of material fact as to consumer confusion, especially given that this inquiry focuses on the consuming public as a whole, not interested parties already familiar with the plaintiff's mark through personal connections"). Here, the evidence of actual confusion presented by Fuel comes solely from acquaintances or friends of Mr. Gould or from athletes sponsored by Fuel. Thus, the evidence does not accurately reflect the actual confusion of the public as a whole.

Further, notwithstanding the relationships surrounding the actual confusion evidence, the court finds that the evidence itself is *de minimis*. The record indicates that Fuel's total revenues in 2012, the year in which the NIKE+FUELBAND product launched, exceeded $500,000. ECF No. 70-4 at 3. Despite these revenues, Fuel was only provided evidence of four instances of actual confusion. *See Petro Stopping Ctrs.*, 130 F.3d at 95 (considering the plaintiff's volume of commerce when assessing the *de minimis* nature of actual confusion evidence). Such evidence is insufficient

36

to create a factual issue regarding actual confusion.[6]  *See George II*, 575 F.3d at 399 (affirming the district court's conclusion that the actual confusion evidence was *de minimis* where the plaintiff sold 500,000 games per year but only provided four instances of consumer confusion); *Renaissance I*, 405 F. Supp. 2d at 698 (finding that four instances of actual confusion from persons familiar with the mark and no instances of confusion from the ultimate consumers of the products was *de minimis*).

Accordingly, because Fuel has presented evidence of actual confusion from only four sources, none of which demonstrate confusion among the actual consuming public, the court finds this actual confusion evidence to be *de minimis*.  As such, the seventh likelihood of confusion factor, actual confusion, weighs against a finding of likelihood of confusion.

### h.  Quality of Defendant's Product

The parties agree that this factor is not relevant here, as the Fourth Circuit has recognized that this factor only applies in "situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods.'"  *George II*, 575 F.3d at 399.  The NIKE+FUELBAND and promotional t-shirts do not constitute "knockoffs" of Fuel's products, as they are priced at or above the prices of Fuel's goods.  *See id.* (finding the quality of the defendant's products to be irrelevant where they were priced at or above the prices of the plaintiff's goods).  As such, the eighth likelihood of confusion factor, the quality of defendant's product, weighs neither in favor nor against a likelihood of confusion.

---

[6]     The court notes that Fuel provided an expert report from Jason Wolfe in which Mr. Wolfe opines that actual confusion is present in this case.  However, in reaching this conclusion, Mr. Wolfe relies on the anecdotal evidence provided by Fuel which the court deems to be *de minimis*.  *See* ECF 83-2 at 11.  In that regard, Mr. Wolfe's expert report does not create a genuine issue of fact as to actual confusion.

### i. Sophistication of the Consuming Public

With regard to the ninth likelihood of confusion factor, the sophistication of the consuming public, courts have recognized that this factor will be applicable only when "the relevant market is not the public at-large." *Id.* at 400. In such instances, where "the typical consumer in the relevant market is sophisticated in the use of—or possesses an expertise regarding—a particular product, such sophistication or expertise may be pertinent in determining the likelihood of confusion." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996). While Nike contends that Fuel's customers are "discriminating purchasers" who are likely able to distinguish between Nike's products and Fuel's products, the court finds that the record does not support such a finding. As such, the ninth likelihood of confusion factor, the sophistication of the consuming public, weighs neither in favor nor against a likelihood of confusion.

### j. Overview of Forward Confusion Factors

Based on a consideration of the above-discussed factors, the court finds that no reasonable jury could find likelihood of forward confusion. Although one likelihood of confusion factor, the similarity between the advertising of the parties, weighs in favor of likelihood of confusion, this factor is outweighed by the remaining relevant factors, including the weakness of Fuel's mark, the dissimilarity of the two marks, the lack of bad faith intent, and the *de minimis* evidence of actual confusion. *See George I*, 2008 WL 2883771, at *7 ("[A]lthough some of the likelihood of confusion factors weigh in [the plaintiff's] favor, these factors are so significantly outweighed by the lack of similarity between the marks at issue and the paucity of evidence showing actual confusion that summary judgment will be granted in [the defendant's] favor"); *Swatch*, 888 F. Supp. 2d at 756 ("Having considered the relevant factors, it is inescapable that some favor [the plaintiff] . . .

38

[h]owever, the most significant factor, actual confusion, weighs decidedly against [the plaintiff] . . . [and] [w]hen combined with the lack of similarity between the marks, lack of predatory intent, lack of similar advertising and only minimal similarity in facilities, the Court finds that there Is no likelihood of confusion.") (internal quotations omitted).  Accordingly, the court finds that no likelihood of forward confusion exists among relevant consumers.  *See George II*, 575 F.3d at 400 ("[The Fourth Circuit] [is] aware of no case where a court has allowed a trademark infringement action to proceed beyond summary judgment where two weak marks were dissimilar, there was no showing of a predatory intent, and the evidence of actual confusion was *de minimis*.").

2. Reverse Confusion

As a threshold matter, the court notes that the Fourth Circuit has not yet recognized a reverse confusion claim.  *See Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.,* 188 F.3d 501 (table), 1999 WL 639165, *12 (4th Cir. 1999) ("To date, this Court has not adopted the doctrine of reverse confusion.").  However, district courts within the Fourth Circuit have applied the reverse confusion theory.  *See Coryn II*, 868 F. Supp. 2d at 468 (applying, on a Rule 59(e) motion, the doctrine of reverse confusion when reviewing a jury verdict finding a likelihood of confusion); *Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc.,* 606 F. Supp. 2d 571 (M.D.N.C. 2009) (applying reverse confusion doctrine based on *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198 (3rd Cir. 2000)).  In that regard, the court will consider whether a reverse confusion claim is appropriate in this instance.

As in a forward confusion claim, "the ultimate question in a reverse confusion claim is whether there is a likelihood of consumer confusion as to the source or sponsorship of a product." *A & H Sportswear, Inc.,* 237 F.3d at 229.  "The essence of reverse confusion is that the more

39

powerful junior user saturates the market with a similar trademark and overwhelms the smaller senior user." *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 474 (3d Cir. 2005). The "chief danger inherent in recognizing reverse confusion claims is that innovative junior users, who have invested heavily in promoting a particular mark, will suddenly find their use of the mark blocked by plaintiffs who have not invested in, or promoted, their own marks." *Id.* at 472 n.17. Further, "an overly-vigorous use of the doctrine of reverse confusion could potentially inhibit larger companies with established marks from expanding their product lines." *Id.*

Nike contends that the "chief danger" inherent in recognizing a reverse confusion claim is present here. ECF No. 68 at 46-47. Specifically, Nike contends that it did not overwhelm or saturate Fuel's market because Fuel failed to actively promote and protect its mark even before Nike entered the market. ECF No. 68-1 at 47. In response, Fuel contends that these facts demonstrate the "classic case" of reverse confusion because Fuel has consistently promoted its brand through advertisements, trade shows, and sponsorships, has protected its brand through litigation and agreements, and has continuously operated its brand since 1992. ECF No. 83 at 41-42.

The court finds that the evidence in the record supports the conclusion that a reverse confusion claim is not appropriate in this case. Generally, the effect of reverse confusion is that "the senior user loses the value of [its] trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Coryn I*, 2010 WL 1375301, at *4 n.10. Here, evidence indicates that at the time Nike entered the market, over 1,000 federal trademark registrations existed including the word "Fuel," with at least 15 of these registration registered in International Class 25 and at least 22 of these registrations for the word "Fuel" alone. ECF No. 71-2. Further, Nike provided evidence of numerous non-party uses of the word "Fuel" in

connection with the promotion of apparel and sports related equipment and services. ECF Nos. 71-2 & 71-3. Thus, Nike's entry into the mark did not "overwhelm" Fuel, as the market was saturated upon Nike's entry. *See Freedom Card, Inc.*, 432 F.3d at 475 (rejecting a senior user's claim that the junior user overwhelmed the market as "fanciful at best" when the senior user failed to promote its mark before the junior user entered the market). "[E]ven if [the Fourth Circuit ] were to recognize a claim of 'reverse confusion' emanating from either the Lanham Act or the common law, [Fuel's] new-found claim would be without foundation." *See Globalaw Ltd. v. Carmon & Carmon Law Office*, 452 F. Supp. 2d 1, 58 (D.D.C. 2006). Accordingly, the court finds that no likelihood of reverse confusion exists among relevant consumers.

### 3. Likelihood of Confusion Conclusion

Pursuant to the court's conclusion that no reasonable trier of fact could find likelihood of forward or reverse confusion among relevant consumers, the court recognizes that summary judgment is appropriate as to Fuel's first cause of action for federal trademark infringement, Fuel's second cause of action for common law trademark infringement and unfair competition, Fuel's third cause of action for federal unfair competition and false designation of origin, and Fuel's sixth cause of action for violations of the SCUTPA.[7] *See Lamparello v. Falwell*, 420 F.3d 309, 312-13 (4th Cir. 2005) ("Both infringement and false designation of origin have [the same elements of proof]"); *Monster Daddy, LLC v. Monster Cable Prods., Inc.*, CIV.A. 6:10-1170-MGL, 2013 WL 5467854, at *7 (D.S.C. Sept. 30, 2013) ("The elements of common law and unfair infringement under South Carolina law are identical to the elements for proving a [federal trademark infringement] Lanham

---

[7]    The court notes that by extension, any declaratory relief sought by Fuel in its fifth cause of action with respect to these causes of action fails as well.

Act claim"); *Johnson v. Sosebee*, 397 F. Supp. 2d 706, 712 (D.S.C. 2005) ("The standard for liability for trademark infringement under the South Carolina Unfair Trade Practices Act [UTPA], like that of the Lanham Act, is likelihood of consumer confusion.").[8] However, the court's determination that no reasonable trier of fact could find likelihood of confusion in this matter does not support granting summary judgment in favor of Nike as to Fuel's fourth cause of action for federal trademark dilution. *See CareFirst*, 434 F.3d at 274 ("The statutory scheme makes clear that a court may find dilution even if it would not find any likelihood of confusion"); *Circuit City Stores, Inc. v. OfficeMax, Inc.*, 949 F. Supp. 409, 412 (E.D. Va. 1996) ("[T]he new federal claim for trademark dilution differs from traditional trademark theory in at least one very significant way: the plaintiff need not show likelihood of confusion between the trademarks at issue.").  Accordingly, the court grants Nike's motion for summary judgment as to Fuel's claims for federal trademark infringement, common law trademark infringement and unfair competition, federal unfair competition and false designation of origin, and violations of the South Carolina Unfair Trade Practices Act.

**C.     *Fuel's Federal Trademark Dilution Claim***

Pursuant to the court's finding that no reasonable trier of fact could find likelihood of forward or reverse confusion among relevant consumers, the only remaining claim is Fuel's fourth cause of action for federal trademark dilution.  The Federal Trademark Dilution Act ("FTDA") provides that "the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has

---

[8]     Because the court finds that summary judgment is appropriate as to Fuel's SCUTPA claim based on its finding that no reasonable trier of fact could find likelihood of forward or reverse confusion among relevant consumers, the court need not address the parties' arguments with respect to the public interest prong of SCUTPA.

become famous, commences use of a mark or trade name in commerce that is likely to cause dilution . . . ." 15 U.S.C. § 1125. To succeed on a federal dilution claim, a plaintiff must show that "1) it owns a famous, distinctive mark, 2) the defendant uses an allegedly diluting mark in commerce, 3) an association arose from the similarity of the marks, and 4) the association is likely to impair the distinctiveness of the famous mark." *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 163 (4th Cir. 2014).

The court recognizes that a consideration of whether a mark is famous for the purposes of a dilution claim is similar to a consideration of the strength of the mark for the purposes of a trademark infringement claim. *See Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 749 (S.D.N.Y. 1997) ("The determination whether a mark is famous and distinctive under Section 43(c)[of 15 U.S.C. § 1125] is similar to the analysis for strength of the mark for trademark infringement purposes."). However, the court further recognizes that Nike's motion for summary judgment only explicitly seeks summary judgment on Fuel's federal trademark dilution claim based on the affirmative defense of abandonment. Nike's motion does not address Fuel's federal trademark dilution claim in the context of its likelihood of confusion arguments. As a result, the parties do not directly address the merits of Fuel's federal trademark dilution claim in their summary judgment briefs. Thus, the court is without the parties' full positions on Fuel's federal trademark dilution claim at this time. Accordingly, the court denies Nike's motion for summary judgment with respect to Fuel's federal trademark dilution claim, without prejudice to Nike filing a renewed motion for summary judgment addressing the merits of Fuel's federal trademark dilution claim within thirty (30) days from the date of this order.

## IV. CONCLUSION

For the foregoing reasons, Nike's motion for summary judgment, ECF No. 68, is **GRANTED IN PART** and **DENIED IN PART**. Specifically, Nike's motion for summary judgment is **GRANTED** as to Fuel's claims for federal trademark infringement, common law trademark infringement and unfair competition, federal unfair competition and false designation of origin, and violations of the South Carolina Unfair Trade Practices Act. Nike's motion for summary judgment as to Fuel's federal trademark dilution claim is **DENIED WITHOUT PREJUDICE** to Nike filing a renewed motion for summary judgment addressing the merits of Fuel's federal trademark dilution claim within thirty (30) days from the date of this order.

**IT IS SO ORDERED.**

s/Margaret B. Seymour
Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina
March 20, 2014